1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

7  OSTERHAUS PHARMACY, INC., CAMMACK'S
   PHARMACIES, INC. DBA JIM'S PHARMACY
8  AND HOME HEALTH, HARBOR DRUG CO.,
   INC., VALU DRUGS INC., and MEDFORD
9  PHARMACY GROUP LLC DBA WEST MAIN
   PHARMACY, on behalf of themselves and all
10 others similarly situated,
11
                    Plaintiffs,
12
13              v.
14 UNITEDHEALTH GROUP INCORPORATED;
   OPTUM, INC.; OPTUMRX, INC.; OPTUMRX
15 HOLDINGS, LLC,
16
                    Defendants.
17

NO. 2:23-cv-01944-RSL

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

18

19      Plaintiffs Osterhaus Pharmacy, Inc. ("Osterhaus" or "Osterhaus Pharmacy"), Cammack's

20 Pharmacies, Inc. d/b/a/ Jim's Pharmacy and Home Health, ("Jim's" or "Jim's Pharmacy"), Harbor

21 Drug Co., Inc., Valu Drugs Inc., and Medford Pharmacy Group LLC d/b/a West Main Pharmacy

22 ("West Main Pharmacy") bring this action on behalf of themselves and all others similarly

23 situated pursuant to Rule 23 of the Federal Rules of Civil Procedure against defendants

24 UnitedHealth Group, Inc.; Optum, Inc.; OptumRx, Inc.; and OptumRx Holdings, LLC (collectively,

25 "OptumRx"). Plaintiffs seek damages for violation of Sections 1 and 2 of the Sherman Act, 15

26 U.S.C. §§ 1, 2, breach of contract, and breach of the covenant of good faith and fair dealing.

27      Plaintiffs also seek equitable and declaratory relief on the basis of claims for unjust

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    enrichment, unconscionability, violation of the federal Medicare laws, and quantum meruit.

2    I.     <u>NATURE OF THE ACTION</u>

3        Plaintiffs are pharmacies that bring seven claims on behalf of themselves and a

4    proposed class.

5        The first is a claim under federal antitrust law. It is based on OptumRx denying

6    pharmacy services providers access to its network of Medicare Part D beneficiaries to fill and

7    dispense their prescriptions unless the pharmacy services providers also enter a second

8    transaction involving a performance program that compels the pharmacy services providers to

9    pay fees for the "opportunity" to provide other performance-related services. As explained

10   below, those fees are called "DIR fees" or "Penalties."

11       The second claim is for breach of contract. OptumRx has promised to comply with all

12   laws and regulations—including the Any Willing Provider, Prompt Payment, and Insurance Risk

13   laws—and has failed to do so.

14       The third claim is a claim for declaratory relief that OptumRx violated federal Medicare

15   laws, including the Any Willing Provider, Prompt Payment, and Insurance Risk provisions.

16       The fourth claim is for breach of the covenant of good faith and fair dealing. OptumRx

17   forced pharmacy services providers—including Plaintiffs and members of the proposed class—

18   to agree to grant it discretion in setting metrics for and calculating the DIR fees pharmacy

19   services providers must pay. OptumRx then exercised that discretion in bad faith and thereby

20   breached the covenant.

21       The fifth claim is for a declaratory judgment that the DIR fees that OptumRx imposed

22   are unconscionable.

23       The sixth claim is for unjust enrichment, requiring OptumRx to return to Plaintiffs and

24   members of the proposed class DIR fees that OptumRx's unconscionable contracts required

25   them to pay.

26       A seventh claim is for quantum meruit, requiring OptumRx to pay Plaintiffs and

27   members of the proposed Class for the value of the DIR services they provided.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    Plaintiffs and the proposed class seek recovery of more than $5,000,000.

2    **II.    JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

3    1.    Plaintiffs bring this action pursuant to Section 4 of the Clayton Act, 15

4    U.S.C.§§ 15(a), to recover treble damages, cost of suit, and reasonable attorneys' fees for

5    OptumRx's violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2. This

6    Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d)(2) and 1337(a). The

7    Court possesses supplemental jurisdiction over Plaintiffs' claims for breach of covenant of good

8    faith and fair dealing, unconscionability, unjust enrichment, and quantum meruit under 28

9    U.S.C. § 1367.

10    2.    This Court has personal jurisdiction over the defendants pursuant to, among

11    other statutes, Section 12 of the Clayton Act, 15 U.S.C. § 22.

12    3.    Venue is proper in this Court pursuant to, among other statutes, Section 12 of

13    the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because OptumRx regularly transacts

14    business within this district, a substantial portion of the affected interstate trade and

15    commerce discussed below has been carried out in this District, and OptumRx resides in this

16    district.

17    4.    The services at issue in this case are sold in interstate commerce. The unlawful

18    activities alleged in this Complaint have occurred in, and have had substantial effect upon,

19    interstate commerce in the United States.

20    **III.    PARTIES**

21    5.    Until January 1, 2022, Osterhaus operated as Osterhaus Pharmacy and M&M

22    Care at 918 W Platt St #2, Maquoketa, IA.

23    6.    Jim's Pharmacy is a corporation organized under the laws of Washington with its

24    principal place of business at 424 East Second Street, Port Angeles, Washington. It is a locally

25    owned community pharmacy.

26

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

7.      Harbor Drug Co., Inc. is a corporation organized under the laws of Washington with its principal place of business located at 316 8th St., Hoquiam, Washington. It is a locally owned community pharmacy.

8.      Valu Drugs Inc. is a corporation organized under the laws of Washington, with its principal place of business located at 201 Pioneer Ave., E., Montesano, Washington. It is a locally owned community pharmacy.

9.      Medford Pharmacy Group LLC d/b/a West Main Pharmacy is a limited liability company organized under the laws of Washington. Its principal place of business is located at 2355 W. Main St., Medford, Oregon. It is a locally owned community pharmacy.

10.      Plaintiffs bring this action on behalf of themselves individually and on behalf of a proposed class of pharmacy services providers, including but not limited to retail pharmacies, compounding pharmacies, and physician dispensaries but excluding mail order pharmacies, that:

1.      are not part of the same corporate family as any of the three largest Pharmacy Benefits Managers ("PBMs"), as defined below, and so are independent of the three largest PBMs ("Independents");

2.      are located in the United States; and

3.      paid any DIR fees directly to OptumRx from December 18, 2019 until the time of trial.

11.      UnitedHealth Group Incorporated ("UnitedHealth Group") has been the fifth largest company in the United States for three consecutive years[1] and is one of the largest healthcare companies in the world. OptumRx is the name of UnitedHealth Group's PBM business, and it is one of the largest PBMs in the United States. While various legal entities within UnitedHealth Group perform PBM activities, they all do so under the OptumRx name. All are direct or indirect subsidiaries of UnitedHealth Group. UnitedHealth Group also owns one of

---

[1] *UnitedHealth Group*, Fortune 500 (2023), https://fortune.com/company/unitedhealth-group/fortune500/.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   the largest health insurance companies in the United States, UnitedHealthcare, and a mail

2   order pharmacy that is the fourth largest pharmacy chain in the nation.[2] In 2022, the

3   UnitedHealth Group corporate family generated over $324 billion in revenue.[3] OptumRx

4   generated almost $100 million of this revenue.[4]

5       12.    In 2022, UnitedHealth Group reported that OptumRx managed $124

6   billion in pharmaceutical spending.[5]

7                                    **OptumRx Entities**

8       13.    OptumRx provides PBM services to Medicare Part D beneficiaries through

9   numerous legal entities.

10      14.    Defendant UnitedHealth Group Incorporated is a Delaware corporation with its

11  principal place of business in Minnesota.

12      15.    Defendant Optum, Inc. is a Delaware corporation.

13      16.    Defendant OptumRx, Inc. is a California corporation.

14      17.    Defendant OptumRx Holdings, LLC is a limited liability company incorporated

15  under the laws of Delaware.

16      18.    UnitedHealth Group Incorporated directly or indirectly owns Optum, Inc.,

17  OptumRx, Inc., and OptumRx Holdings, LLC.

18                              **IV.    FACTS**

19                     **Independent Pharmacy Services Providers**

20      19.    In 1965, Bob and Ann Osterhaus purchased a family-owned pharmacy in

21  Maquoketa, a town of a few thousand residents in Northeast Iowa. Their son, Matt Osterhaus,

22  began working at the pharmacy in 1983, and eventually operated it with his wife Marilyn

23  ─────────────────

24  [2] Adam J. Fein, *The Top 15 U.S. Pharmacies of 2022: Market Shares and Revenues at the Biggest Companies*, Drug Channels (Mar. 8, 2023), https://www.drugchannels.net/2023/03/the-top-15-us-pharmacies-of-2022-market.html.

25  [3] Form 10-K, UnitedHealth Group Incorporated (2022),

26  https://www.sec.gov/Archives/edgar/data/731766/000073176623000008/unh-20221231.htm.
    [4] *Id.*

27  [5] *Id.*

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    Osterhaus. In 2005, Bob Osterhaus was awarded the Remington Medal, the highest recognition

2    given in the pharmacy profession, for his dedication. In 2005, Matt Osterhaus was awarded the

3    Distinguished Achievement Award in Community Pharmacy Practice for his contributions to the

4    conversion of the pharmacy into a pharmaceutical care model of practice. Not only has

5    Osterhaus Pharmacy served the community, it also has trained the next generation of Iowa

6    pharmacists. Since 1995, Osterhaus Pharmacy has served as a teaching site for Doctor of

7    Pharmacy candidates including from the University of Iowa, located around 90 miles away. In

8    1997, Osterhaus Pharmacy, another pharmacy and the University of Iowa teamed up to offer a

9    post graduate residency program—the first community-based residency in Iowa.

10        20.    In January 2022, Matt Osterhaus sold Osterhaus Pharmacy because of PBMs'

11    actions, including OptumRx's actions described in this complaint.

12        21.    Jim's Pharmacy is a locally owned community pharmacy in Port Angeles,

13    Washington, founded by husband-and-wife team Jim and Barb Cammack. The Cammacks

14    opened Jim's Pharmacy in Port Angeles in 1983. Jim and Barb retired in 2002 and their son, Joe

15    Cammack, acquired Jim's Pharmacy. Currently, in addition to offering traditional pharmacy

16    services, Jim's provides diabetic education to the community, adult and pediatric vaccinations,

17    a "Free Vitamins for Kids" program offering free chewable vitamins to children ages 2 to 12, and

18    a charitable giving program that has donated to local charities since 2008.

19        22.    Plaintiffs, like most Independent owners and pharmacists, are community

20    leaders. They are actively involved in community-oriented public health, civic, and volunteer

21    projects. They are committed to high-quality pharmacist care and to restoring, maintaining, and

22    promoting the health and well-being of the public they serve.

23        23.    Like Plaintiffs, many Independents have a substantial impact on their

24    communities. Independents meet the needs of their patient populations like no other

25    institution. They provide wellness services, health screening, case management, medication

26    synchronization, adherence packaging, personal delivery, long-term care support,

27    immunizations, customized compounding services, and wound care products. Pharmacists and

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    other providers at Independents routinely develop supportive relationships with their patients

2    in ways that large corporate pharmacy services providers and mail-order pharmacists do not.

3    Independents fully subscribe to their mantra: "We believe in doing what is right for the

4    patient."

5         24.    Independent pharmacy service providers work with patients to fill and dispense

6    prescriptions, help manage medication, counsel patients on the use of both prescription and

7    over-the-counter medications, and provide other health-related services, such as vaccine shots.

8         25.    Independents are rooted in their communities. They are America's most

9    accessible health care professional—and one of only a few in many parts of the country.[6] The

10   independent pharmacy services provider plays an essential role in those areas, which

11   frequently have shortages of healthcare workers.

12        26.    Independents are closing in significant numbers in key locations across the

13   nation. They face increasing financial pressure from PBMs, which keep reducing

14   reimbursements to increase their own profits. The trend toward vertical consolidation in the

15   pharmaceutical services industry has exacerbated matters, as PBMs now benefit by placing

16   Independents at a disadvantage to their in-house pharmacies.

17        27.    According to a University of Iowa study, 1,231 of the 7,624 independent rural

18   pharmacies in the nation closed between 2003 to 2018.[7] That has left 630 rural communities

19   that had at least one retail pharmacy in 2003 with none in 2018.[8] Since 2018, many more

20   stores—often called "practices"—have closed. Those closures are forcing rural populations to

21

22   _____

23   [6] *See* David M. Scott et al., *Assessment of Pharmacist's Delivery of Public Health Services in Rural and Urban Areas in Iowa and North Dakota*, Pharmacy Practice (2016); Megan Undeberg, et al., *A Case of Pharmacist-Led Care Team Interventions to Maximize Rural Patient Quality of Life*,

24   Exploratory Research in Clinical and Social Pharmacy (Mar. 8, 2021).

25   [7] *Id.*

26   [8] Abiodun Salaki et al., *Update: Independently Owned Pharmacy Closures in Rural America 2003-2018*, University of Iowa Center for Rural Health Policy Analysis (July 2018),

27   https://rupri.publichealth.uiowa.edu/publications/policybriefs/2018/2018%20Pharmacy%20Closures.pdf.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    travel greater distances to obtain needed medications, a particular hardship for low-income

2    individuals and the elderly. [9]

3        28.    Because of the loss of Independents, over 40% of counties in the United States

4    are considered "pharmacy deserts," where most people must travel significant distances to

5    reach the nearest pharmacy.[10] That can be insurmountable for people who lack transportation,

6    time, or both, especially the poor and the elderly.

7        29.    The loss of Independents has been particularly damaging in areas where they not

8    only distributed prescription medications, but also delivered services such as immunizations,

9    medication counseling and educational services, patient consultations, and treatment of mild

10    illnesses amenable to over-the-counter medications.[11] During the Covid-19 pandemic,

11    Independents were essential, dispensing vaccinations and testing for Covid-19. Closure of these

12    pharmacy services providers can have a devastating impact on a community's access to

13    healthcare services.

14        30.    Even the Centers for Medicare and Medicaid Services ("CMS" or "Medicare"),

15    which has a policy that it does not involve itself in contract negotiations, recently wrote:

16    "Pharmacies serve a critical role in delivering health care and providing access to medications

17    across the country. CMS is concerned about the sustainability of these businesses, especially

18    small and independent pharmacies, and their potential closures that may leave pharmacy

19    services out of reach for many people, especially those in rural and underserved areas."[12] This

20    letter is attached as Exhibit 1.

21

22

23    _____

   [9] *Id.*

24    [10] Kristine Pisikian, *How Pharmacy Deserts Impact Communities*, GoodRx Health (Mar. 30, 2022), https://www.goodrx.com/hcp/providers/pharmacy-deserts.

25    [11] Salaki, *supra* n. 8.

26    [12] Letter from Office of the Administrator, Centers for Medicare & Medicaid Services, to Pharmacy Benefit Managers, Medicare Part D Plans, Medicaid Managed Care Plans, and Private

27    Insurance Plans (Dec. 14, 2023).

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

31.     In contrast to the growth of national pharmacy chains, the market share of non-corporate-affiliated independent pharmacies has shrunk 50% over recent decades.[13]

**Pharmacy Services**

32.     Pharmacy services providers vary in the services they provide. Typically, pharmacy services providers fill and dispense prescriptions and receive reimbursement for doing so—a service referred to as "Filling and Dispensing Services."

33.     Some Independents  also provide other services ("Ancillary Services") outside the scope of Filling and Dispensing Services. Ancillary Services can consist of services to support customer medication management, including medication synchronization (synchronizing chronic medications to a single monthly pick-up date), medication therapy management, and multi-dose packaging that bundles medications.

**Medicare Prescription Drug Benefit (Part D)**

34.     Medicare is a federally funded health insurance program for persons aged 65 and older and persons with long-term disabilities. The Medicare prescription drug benefit, Medicare Part D ("Part D"), offers outpatient prescription drug coverage to Medicare beneficiaries across the country. Part D was enacted as part of the Medicare Modernization Act of 2003. Part D coverage is administered through private health plans ("Part D Sponsors" or "Plans") that contract with the federal government. Part D Sponsors are often run by large health insurance companies, including Aetna, Cigna, and UnitedHealthcare.

35.     The Part D Sponsors, in turn, contract with corporate intermediaries—*i.e.*, PBMs—to administer their prescription drug benefits.

---

[13] Alok Ladsariya, et al., *Meeting Changing Consumer Needs: The US Retail Pharmacy of the Future*, McKinsey & Company (Mar. 17, 2023), https://www.mckinsey.com/industries/healthcare/our-insights/meeting-changing-consumer-needs-the-us-retail-pharmacy-of-the-future.

FIRST AMENDED  CLASS ACTION COMPLAINT - 9

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

36.     In 2023, approximately 52 million of the 66 million people covered by Medicare were enrolled in Part D.[14] Because Medicare recipients are prescribed more drugs on average than the population as a whole, Medicare beneficiaries constitute an outsized percentage of prescriptions filled in the United States.

**PBMs: Powerful Middlemen**
**Standing Between Patients and their Medications**

37.     PBMs are powerful middlemen in the center of the pharmaceutical industry.[15] They profit at nearly every stage of the drug distribution chain from manufacturing to filling and dispensing to patients.

38.     PBMs act as intermediaries between Part D Plans, pharmacy services providers, and drug manufacturers. Part D Plans own or hire PBMs to negotiate drug pricing with manufacturers, and to determine the amount pharmacy services providers will be reimbursed for dispensing.

39.     PBMs also offer administrative services to Part D Plans, including organizing networks of pharmacy services providers that contract with the Plans ("in-network pharmacy services providers") and determining the list of drugs ("formularies") covered by the Plans.

40.     In sum, PBMs control every facet of the pharmaceutical filling and dispensing industry. They decide which pharmacy services providers can dispense drugs in Part D Plan networks, which drugs those pharmacy services providers will dispense, and the prices, discounts, and other terms of sale applicable to reimbursement of pharmacy services providers.

---

[14] *Medicare Enrollment Numbers*, Center for Medicare Advocacy (June 29, 2023), https://medicareadvocacy.org/medicare-enrollment-numbers/.

[15] Federal Trade Commission, Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies, Interim Staff Report, July 2024 ("FTC Report") at 1 ("PBMs are at the center of the complex pharmaceutical distribution chain that delivers a wide variety of medicines from manufacturers to patients. PBMs serve as middlemen, negotiating the terms and conditions for access to prescription drugs for hundreds of millions of Americans.")

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

41.     Unfortunately, OptumRx, like other PBMs, abuses its control of the industry. In 2023, the Ohio Attorney General brought a lawsuit against PBM Express Scripts, describing the impact of PBMs as follows:

> PBMs are modern gangsters… . They were designed to protect and negotiate on behalf of employers and consumers after Big Pharma was criticized for overpricing medications, but instead they have absolutely destroyed transparency, scheming in the shadows to control drug prices on all sides of the market.[16]

42.     Market consolidation and vertical integration have transformed PBMs and their corporate parents into sprawling entities with outsized market power and soaring profits.

43.     CMS recently had to "urge plans and PBMs to engage in sustainable and fair practices with all pharmacies – not just pharmacies owned by PBMs" noting the "increasing level of vertical integration that is occurring among plans, PBMs, and their own pharmacies" can result in "anticompetitive behavior and place independent pharmacies at a disadvantage."[17]

44.     Today, just six PBMs control 95% of the prescriptions filled in the United States. The "Big Three" PBMs—OptumRx, Express Scripts, and CVS Caremark—control more than 80% of the prescriptions filled in the United States ("PBM Market") and each generates tens of billions of dollars in annual revenue.

45.     A recent investigation by the U.S. House of Representatives Committee on Oversight and Accountability Staff found the "three largest PBMs have used their position as

---

[16] Complaint, State of Ohio, ex rel. Dave Yost v. Ascent Health Services LLC et al., No. 23-CV-H-03-00179 (Ohio Ct. Com. Pl. Mar. 27, 2023).

[17] Letter from Office of the Administrator, Centers for Medicare & Medicaid Services, to Pharmacy Benefit Managers, Medicare Part D Plans, Medicaid Managed Care Plans, and Private Insurance Plans (Dec. 14, 2023).

FIRST AMENDED  CLASS ACTION COMPLAINT - 11

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

middlemen and integration with health insurers, pharmacies, providers, and recently manufacturers, to enact anticompetitive policies and protect their bottom line." [18]

46.    The market power of the Big Three PBMs has been magnified by a trend toward vertical integration. Each of the Big Three is now affiliated with a dominant health insurer: OptumRx (PBM) is affiliated with UnitedHealthcare (health insurer), Express Scripts (PBM) is affiliated with Cigna (health insurer), and CVS Caremark (PBM) is affiliated with Aetna (health insurer). Each of these affiliated health insurers—UnitedHealthcare, Aetna, and Cigna— administers Part D Plans for Medicare beneficiaries. These three health insurers cover almost half of Medicare Part D beneficiaries.

47.    This vertical consolidation has served OptumRx well. It now controls not just the pricing of drugs, not just the selection of the drugs covered by Part D Plans, and not just the selection of pharmacy services providers in each Part D network; OptumRx also controls *access to almost a quarter of the Medicare beneficiaries enrolled in PBM-affiliated Plans.*[19] Independents must accept the increasingly anticompetitive pricing and contract terms set forth by OptumRx or face exclusion from its Part D network.

48.    Not participating in OptumRx's network would severely limit a pharmacy services provider's access to a critical mass of patients. Participating in other networks is not a substitute—if an Independent does not accept the anticompetitive terms from OptumRx, it loses the patients in OptumRx's network. Those patients must take their prescriptions to a different pharmacy services provider to enjoy the benefits of their Medicare Part D Plans.

49.    Further, beneficiaries do not choose Part D Plans based on DIR fees. The AARP, for example, offers a guide that recommends beneficiaries consider which pharmaceuticals a

---

[18] The Role of Pharmacy Benefit Managers in Prescription Drug Markets: Report Prepared by the House Committee on Oversight and Accountability Staff, July 2024 ("House Oversight Staff Report") at 4.
[19] Adam Fein, *The Top Pharmacy Benefit Managers of 2022: Market Share and Trends for the Biggest Companies*, Drug Channels (May 23, 2023), https://www.drugchannels.net/2023/05/the-top-pharmacy-benefit-managers-of.html.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Plan covers, its cost, its customer services rating, and other factors.[20] Nowhere does it mention

2  DIR fees.

3      50.    To serve the millions of beneficiaries enrolled in OptumRx-affiliated Plans,

4  Independents generally have no practical choice but to participate in the OptumRx network.

5  Currently, over 67,000 pharmacies across the U.S. do so.[21]

6      51.    OptumRx's vertical integration and the concentrated market create incentives

7  for it to abuse its resulting market power. Its corporate family can and does benefit from

8  imposing anticompetitive pricing on Independents and extracting services from them. If

9  OptumRx goes too far, driving Independents out of business, UnitedHealth Group then benefits

10  from eliminating rivals and steering its customers toward OptumRx's mail-order pharmacy.

11  Either way, OptumRx wins and the Independents and patients lose.

**Direct and Indirect Remuneration ("DIR") Fees: A Narrow Loophole**

13      52.    When a prescription drug is dispensed to a Medicare beneficiary (a patient), the

14  beneficiary pays a co-payment to the pharmacy services provider at the point-of-sale.

15      53.    Congress anticipated and required that Medicare beneficiaries would receive the

16  full benefit of any PBM discounting when they pay for a drug at the time it is dispensed to

17  them. The Medicare statute requires that beneficiaries be provided with access to the true

18  "negotiated prices" for drugs covered under Medicare Part D at the point of sale. 42 U.S.C.

19  §1395w-102(d)(1)(A). The statute further states that "negotiated prices shall take into account

20  negotiated price concessions, such as discounts or indirect subsidies, rebates, and direct or

21  indirect remunerations, for covered Part D drugs, and include any dispensing fees for such

22  drugs." *Id.* at §1395w-102(d)(1)(B).

23

24  _____

25  [20] Kimberly Lankford, *How can I pick the best Medicare Part D prescription drug plan for my needs?* AARP (May 20, 2022), https://www.aarp.org/health/medicare-qa-tool/choosing-best-

26  drug-plan-for-me.html.

27  [21] Form 10-K, UnitedHealth Group Incorporated (2022), https://www.sec.gov/Archives/edgar/data/731766/000007317662300008/unh-20221231.htm.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

54.     Congress was clear that it wanted all price concessions to be included in the negotiated price to beneficiaries at the point-of-sale. The Conference Report to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 stated the following: "Qualified drug plans would be required to provide beneficiaries with access to negotiated prices (including all discounts, direct or indirect subsidies, rebates, other price concessions, or direct or indirect remunerations), regardless of the fact that no benefits may be payable." H.R. Rep. No. 108-391, at 438 (2003) (Conf. Rep.). The legislative history further added that "all PDP plans will be required to make available to their enrollees the benefit of *all* price discounts." H.R. Rep. No. 108-178, pt. 1, at 184 (2003) (emphasis added).

55.     CMS enacted regulations that defined "negotiated prices" under Medicare Part D as prices for covered drugs that are "reduced by those discounts, direct or indirect subsidies, rebates, other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale." 42 C.F.R. §423.100.

56.     In 2014 rulemaking, CMS declared that "we believe that the best interpretation of statutory intent is that all pharmacy price concessions must be reflected in the negotiated price." 79 Fed. Reg. 1973. It drafted a regulation that was intended to further clarify Congressional intent regarding "negotiated prices" under the Medicare Part D program.  In the rulemaking process, the agency stated the following:

> [W]hen price concessions from pharmacies are reflected in forms other than the negotiated price, the degree of price concession that the pharmacy has agreed to is no longer reflected in the negotiated prices available at point of sale or reflected on the Medicare Prescription Drug Plan Finder (Plan Finder) tool. Thus, the true price of drugs at individual pharmacies is no longer transparent to the market. Consequently, consumers cannot efficiently minimize both their costs (cost sharing) and costs to the taxpayers by seeking and finding the lowest-cost drug/pharmacy combination. Moreover, as the coverage gap closes, there are fewer and fewer beneficiaries who are exposed to the full cost of drug products, either at the point of sale or as reflected in Plan Finder estimates. When this occurs, the basis of competition shifts from prices to cost sharing, and the pricing signals available to the market can be distorted when lower cost sharing is not aligned with lower prices. Thus, we believe the exclusion of pharmacy price

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

concessions from the negotiated price thwarts the very price competition that the Congress intended when it said that private plans would compete with other plans on both premiums and negotiated prices.

57.    The proposed rules went into effect on January 1, 2016, and required all price concessions from network pharmacies to be included in the "negotiated prices" established between the pharmacy and the PBM, except for what the agency deemed a "narrow" exception.  This narrow exception to the general rule excluded from the negotiated price "those contingent price concessions that cannot reasonably be determined at the point-of-sale."

58.    OptumRx exploited  this narrow exception in the new regulation to unlawfully extract huge sums of money from pharmacy service providers by imposing after-the-fact Penalties that *purportedly* could not be determined at the point of sale. The Penalties, labeled as "DIR fees," were imposed through OptumRx's "contingent medication adherence performance fee" (hereinafter, OptumRx's "Penalty Program").

59.    In making these rules, CMS did not anticipate the explosion of after-the-fact Penalties imposed by PBMs and labeled as "DIR fees." CMS rulemaking reflected its belief that the amount of money that could not be determined at the point of sale would be minimal.

60.    OptumRx and other PBMs justified these new after-the-fact Penalties by claiming that they were based on "performance" standards (although those standards were a sham).  In so doing, OptumRx could claim that these Penalties could not be calculated at the point of sale and therefore need not be accounted for in the price paid by the Medicare Part D Plans and their beneficiaries at the point of sale.

61.    Penalties labeled as "DIR fees" exploded in volume. From 2010 to 2022, DIR fees charged by PBMs grew from $8.9 million to $17.1 billion, until CMS responded by eliminating the exception altogether as of January 1, 2024.  In other words, PBM DIR fees grew by nearly 2,000 times over twelve years, until CMS finally attempted to end this improper practice. Pharmacy price concessions in the form of DIR increased from $8,869,374 in 2010 to $12.6 billion for 2021. In 2021, DIR fees increased an additional 33% from 2020 levels to $12.6 billion,

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

totaling 6% of gross Part D spending. In 2022, pharmacies paid $17.1 billion in DIR fees, or approximately 7% of gross expenditure for Medicare Part D.

62.    In 2018, CMS informed PBMs and Part D Sponsors that their manipulation of pharmacy price concessions after the point of sale is anti-competitive: "The one-sided nature of the pharmacy payment arrangements that currently exist also *creates competition concerns* by discouraging independent pharmacies from participating in a plan's network and thereby increasing market share for the sponsors' or PBMs' own pharmacies. Part D is a market based approach to delivery of prescription drug benefits, and relies on healthy market competition. Thus, adopting policies that promote competition is an important and relevant consideration in protecting Medicare beneficiaries and the Medicare trust fund from unwarranted costs. Market competition is best achieved when a wide variety of pharmacies are able to compete in the market for selective contracting with plan sponsors and PBMs." 83 Fed. Reg. 62,176 (emphasis added).

63.    As the market power of the PBMs continues to grow, Independents continue to close in significant numbers. Many closed amidst the stress imposed by PBM DIR fees.[22]

64.    OptumRx benefitted whether Independents survived and continued to pay DIR fees or whether the fees drove Independents out of business. On one hand, OptumRx's corporate family profited from DIR fees in various ways, including by retaining them as a source of revenue. On the other hand, OptumRx's corporate family ran a large mail-order pharmacy. When other pharmacy services providers failed, OptumRx's corporate family faced less competition. Either way it benefitted.

---

[22] Markian Hawryluk, *How Rural Communities are Losing Their Pharmacies*, KFF Health News (Nov. 15, 2021), https://kffhealthnews.org/news/article/last-drugstore-how-rural-communities-lose-independent-pharmacies/.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**A Square Peg in a Round Loophole**

65.     For over half a decade, OptumRx imposed increasing DIR fees on Independents based on "performance criteria" metrics, many of which made no sense for pharmacy services providers.

66.     Realizing an opportunity to pilfer money from Independents purportedly under the 2016 CMS changes, OptumRx fabricated fees that it claimed "could not be calculated at the point of sale."

67.     OptumRx imposed contracts on Independents in which they were assessed post-point-of-sale DIR fees, purportedly to encourage better performance by pharmacy services providers. OptumRx's system for assessing fees meant that DIR fees were not known until long after pharmacy services providers filled and dispensed medications because the fees supposedly relied on patient data and outcomes. Therefore, according to OptumRx, DIR fees could not "reasonably be determined at the point-of-sale."

68.     Various attributes of OptumRx's DIR fees were striking. First, they forced pharmacy services providers to *pay* for the opportunity to provide certain Ancillary Services. OptumRx charged Independents DIR fees in amounts that depend on how it assessed their performance. DIR fees were assessed on all or nearly all Independents.

69.     A second striking attribute of DIR fees is that they coerced pharmacies to produce outcomes over which they had little or no control. Although OptumRx claims that its "performance criteria" were designed to measure pharmacy performance, the criteria either did not do so or they did so poorly. OptumRx's metrics for measuring pharmacy performance were based on Medicare's Star Rating system, Medicare's system for rating the performance of *Part D Insurance Plans*. The "performance criteria" monitored things such as adherence to certain prescription drugs, including for hypertension, cholesterol, and diabetes. OptumRx also monitored generic compliance rates.

70.     But the Star Ratings were developed to rate health insurance plans, not pharmacies. As a result, the performance criteria established by OptumRx make little or no

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    sense for pharmacies. Independents were penalized based on criteria that were outside their

2    control—including because they were dependent upon physician prescriptions or were most

3    heavily influenced by patient characteristics such as poverty or access to information.

4         71.    Other factors OptumRx uses, such as generic dispense rates, are not within the

5    control of the pharmacy and are poorly designed to encourage better performance. For

6    example, physicians may prescribe branded medications and instruct a pharmacist to "dispense

7    as written." Physicians may also prescribe branded medications with no generic alternative.

8    Under those circumstances, a pharmacist must dispense the branded drug, but they will be

9    punished and forced to pay higher DIR fees even though they have no influence over the

10   decision to prescribe branded drugs.

11        72.    The purported performance standards particularly harmed specialty pharmacies,

12   such as those treating patients with the most severe diseases, including cancer and HIV.

13   Specialty pharmacies often do not dispense generic drugs or common "maintenance

14   medications," like statins. Yet OptumRx still penalized them for failing to do so.

15        73.    The purported performance standards also particularly harmed pharmacies

16   serving low-income populations. Patients with lower socio-economic status have been shown

17   to have lower medication adherence rates. Pharmacies providing vital services to these

18   populations were disproportionately penalized through OptumRx's purported performance

19   standards.

20        74.    Not only were many of the metrics nonsensical, but so were the ways in which

21   OptumRx applied them. Application of performance metrics is at OptumRx's complete

22   discretion—a discretion OptumRx exercised in bad faith.

23        75.    The way that OptumRx purported to measure performance was illegitimate.

24   Often, OptumRx clumped together large groups of pharmacies—all pharmacies using a

25   particular Pharmacy Services Administrative Organization, or PSAO, for example—and ranked

26   the group's collective performance. Plaintiffs had no control over how the other pharmacies in

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  their grouping performed, yet were penalized based on the performance of these other

2  pharmacies.

3      76.    A third striking feature of OptumRx's DIR fees was their lack of transparency. For

4  incentives to be effective, pharmacy service providers needed to know how they were doing,

5  and how they could improve their performance. But OptumRx provided very little detail on the

6  elusive formulas used to calculate their purported performance metrics.

7      77.    A fourth striking feature of OptumRx's DIR fees was that they were delayed.

8  Pharmacy assessments occurred long after performance—in some cases, more than a year

9  later. Pharmacy service providers thus could not adjust their conduct in real time. That too

10  rendered the DIR fees ineffective at encouraging improved performance.

11      78.    Finally, Plaintiffs are informed and believe that OptumRx in effect implemented a

12  minimum DIR penalty. OptumRx ranked pharmacies into tiers based on their purported

13  performance on various metrics. , OptumRx designed its program so that it was effectively

14  impossible for a pharmacy to achieve the near-perfect scores required to fall in OptumRx's

15  "Fourth Tier" and avoid Penalties. That was particularly clear given OptumRx's practice of

16  grouping pharmacies together and ranking them collectively.

17      79.    In sum, the practical effect of the DIR fees was that Independents were forced to

18  pay to provide Ancillary Services, and the amount they paid was in large part arbitrary,

19  unexplained, unfairly calculated, and untimely.

20      80.    The upshot of OptumRx's unsound methodology was that pharmacy services

21  providers were unfairly treated to their financial disadvantage. OptumRx gained an unfair

22  economic advantage both in revenue to OptumRx and in passthrough payments to Plans,

23  enhancing OptumRx's competitive posture. OptumRx also increased its profits at the expense of

24  the government and Medicare Part D patients—the elderly and the infirm. In fact, CMS, despite

25  its policy of not interfering in contract negotiations, recently noted that there have been "an

26  increasing number of concerns about certain practices by some plans and pharmacy benefit

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    managers (PBMs) that threaten the sustainability of many pharmacies, impede access to care,

2    and put increased burden on health care providers."[23]

3    **OptumRx's Anticompetitive Conduct**

4        81.    Given the option, Independents would choose to provide Filling and Dispensing

5    Services without also having to pay to provide Ancillary Services. But OptumRx used its market

6    power to deprive Independents of that option. OptumRx affirmatively withheld the maximum

7    amount it could assess in DIR fees and the only choice Independents had to not pay DIR fees

8    was to decline to participate in OptumRx's network.

9        82.    OptumRx would not approve Plaintiffs for reimbursement to provide Filling and

10   Dispensing Services to its Medicare Part D Plans unless Plaintiffs also agreed to pay to provide

11   Ancillary Services through the Penalty Program. OptumRx thus abused its market power,

12   coercing Plaintiffs to accept a financial transaction that they did not want, as the price for

13   engaging in a financial transaction that was essential for their core business.  This conduct

14   constituted unlawful agreement in restraint of trade.

15       83.    *Separate Markets*. Separate markets exist for (1) Filling and Dispensing Services

16   and (2) Ancillary Services.

17       84.    OptumRx can be analyzed as a dominant seller or a dominant buyer in the Filling

18   and Dispensing Services market. OptumRx can be viewed as selling access to its valuable

19   networks of Part D beneficiaries in exchange for valuable concessions from Plaintiffs in the

20   terms on which Plaintiffs provide Filling and Dispensing Services. In the alternative, OptumRx

21   can be viewed as a buyer that contracts with Plaintiffs to provide Filling and Dispensing Services

22   to OptumRx's network of Part D beneficiaries. In either case, OptumRx has substantial market

23   power in the Filling and Dispensing Services market, which is highly concentrated.

24

25

26   [23] Letter from Office of the Administrator, Centers for Medicare & Medicaid Services, to
     Pharmacy Benefit Managers, Medicare Part D Plans, Medicaid Managed Care Plans, and Private
27   Insurance Plans (Dec. 14, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT - 20

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

85.      Filling and Dispensing Services and Ancillary Services are not substitutes for each other. If Plaintiffs ceased to provide Filling and Dispensing Services, their customers would lose access to vital medications, regardless of whether Plaintiffs provided Ancillary Services. OptumRx could increase its prices to pharmacies for access to its beneficiaries to provide Filling and Dispensing Services, without those pharmacies choosing instead to acquire access to OptumRx's networks for Ancillary Services, and *vice-versa*.  OptumRx could thus use substantial power in only one of the two markets to impose a small but significant non-transitory increase in prices without having substantial power in the other market.

86.      *Power in the Primary Market*. OptumRx has substantial power in the Filling and Dispensing Services Market ("Primary Market").

87.      Market circumstances establish OptumRx's substantial market power. It is one of the largest PBMs in the United States. The market is concentrated with the collective market share of the top three PBMs at 80% or more. All three of the dominant PBMs impose DIR fees on Independents as a condition of obtaining reimbursement from Plans for filling and dispensing Medicare Part D prescriptions.

88.      Independents generally cannot afford to reject the terms OptumRx imposes for participating in its Medicare Part D network to provide Filing and Dispensing Services. They would lose too many sales to potential patients.

89.      OptumRx has even more market power than its market share would ordinarily confer. There are multiple reasons. One of them is that the other dominant PBMs also impose DIR fees. Such parallel anticompetitive behavior is common in markets with a small number of dominant players.

90.      A second reason is that Independents generally cannot complete transactions with beneficiaries in OptumRx's Medicare Part D by using a different network. They must be part of OptumRx's network or forego reimbursement from the relevant Plan. As a result, this market is different from many others. An automotive repair shop, for example, can avoid a car part manufacturer's tie by purchasing parts from a rival manufacturer. It will lose few, if any,

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

customers or sales by doing so. Independents cannot do the same to avoid losing Medicare Part D customers in OptumRx's network.

91.     Like OptumRx, Plaintiffs can be analyzed as either buyers or sellers in the Primary Market for Filling and Dispensing Services. Plaintiffs can be viewed as buyers paying OptumRx valuable concessions in the terms in which they provide Filling and Dispensing Services, in exchange for access to OptumRx's valuable network of beneficiaries. In the alternative, Plaintiffs can be viewed as a seller that contract with OptumRx to provide Filling and Dispensing Services to OptumRx's network of beneficiaries. In either case, Plaintiffs and OptumRx are engaging in a financial transaction in the Filing and Dispensing Services market, in which OptumRx has market power.

92.     *Coercion in the Secondary Market*. OptumRx used its substantial power in the market for Filling and Dispensing services to coerce Independents to agree to pay to provide Ancillary Services. The market for Ancillary Services is the "Secondary Market."

93.     OptumRx's Penalty Program conditioned transactions in the Primary Market on transactions in the Secondary Market. OptumRx would not let Independents obtain access to beneficiaries in its Medicare Part D network to provide Filling and Dispensing Services— transactions in the Primary Market—unless the Independents also agreed to pay to provide Ancillary Services—transactions in the Secondary Market.

94.     In the absence of OptumRx's anticompetitive contracts—and OptumRx's power in the Primary Market— no Independent would have agreed to *pay* for the opportunity to provide Ancillary Services. Some would have chosen not to provide Ancillary Services even if they would be paid to do so. The rest would charge to provide Ancillary Services, and they would demand enough compensation to cover their costs (plus some profit). Independents provide, and in the absence of the anticompetitive contracts they would provide, different kinds and degrees of Ancillary Services.

95.     OptumRx's conduct had various anticompetitive effects, including artificially inflating the costs to Plaintiffs and other pharmacies for providing those services. The conduct

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

also drove other pharmacies—particularly those in rural areas—to close locations or go out of business, artificially decreasing the quality and quantity of services that pharmacies provide, and limiting access to these critical services for patients, including impoverished and elderly individuals in rural communities.

96.     OptumRx's successful coercion directly establishes OptumRx's substantial power in the Primary Market and its extension of that substantial power into the Secondary Market. OptumRx's ability to use its substantial power in the Primary Market to coerce Independents to agree to pay DIR fees on terms they would otherwise reject is by definition market power.

97.     *Distinct Markets*. The Primary Market and Secondary Market are distinct. As noted above, in the absence of OptumRx's anticompetitive contracts, many Independents would have acquired access to OptumRx's network of Medicare Part D beneficiaries to provide Filling and Dispensing Services without also paying to provide Ancillary Services. That is what many Independents did before OptumRx imposed its Penalty Program. It is what they still do outside of the Medicare Part D context. It is what OptumRx has begun to do again now that the purported loophole is no longer available for post-point of sale DIR fees under CMS regulations. The pervasive imposition of DIR fees by PBMs was a distinctive feature of Medicare Part D Plans for a limited time period.

98.     Further, the kinds of tasks that the Penalty Program penalized pharmacies for failing to perform are tailored to the competencies of prescription drug plans, and healthcare providers such as physicians, not pharmacies. A key reason, as noted above, is that the source of the metrics OptumRx used for calculating DIR fees is the Medicare Part D Star Ratings system. CMS developed that system for assessing Medicare Part D plans, not pharmacies, and has never endorsed performance metrics for pharmacies.  Other healthcare providers are far better positioned than pharmacists to adapt their services to the Star Ratings metrics. Plans, for example, can create incentives to encourage doctors to prescribe appropriate drugs to promote the overall well-being of beneficiaries in a cost-effective manner. Pharmacies cannot. When different kinds of entities are best situated to provide different services, those services

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  generally are part of different markets. It should be unsurprising, then, that the Ancillary

2  Services relevant to OptumRx's DIR fees are not in the same market as the Filling and

3  Dispensing Services that pharmacies historically have provided.

4      99.    *Economic Benefit*. The DIR fees benefit OptumRx in many ways. The OptumRx

5  corporate family, including UnitedHealth Group, receives and retains DIR fees. Further, those

6  fees can to some extent improve management of the health of Part D beneficiaries, decreasing

7  the costs to OptumRx's Plans, including those managed by UnitedHealth Group. DIR Services

8  can improve adherence, increase the filling and dispensing of prescriptions, and thereby

9  generate revenue for OptumRx's corporate family. And the DIR fees give OptumRx's

10 pharmacies a competitive advantage over Independents on costs, increasing its pharmacies'

11 sales volumes.

12     100.   *Effect on Interstate Commerce.*  Given OptumRx's substantial market share and

13 the volume of sales of prescription drugs through OptumRx, OptumRx's Penalty Program

14 affected a substantial amount of interstate commerce in the Primary and Secondary Markets.

15     101.   OptumRx's conduct was unlawful under the rule of reason. OptumRx leveraged

16 its market power to force Plaintiffs to engage in a business transaction—to pay to provide

17 Ancillary Services—on terms no reasonable pharmacy would otherwise accept.

18     102.   OptumRx's conduct harmed Plaintiffs in the manner the antitrust laws were

19 designed to prevent. As a direct result of OptumRx's anticompetitive conduct, Plaintiffs have

20 paid OptumRx millions of dollars for the opportunity to provide Ancillary Services. Consumers

21 and the federal government have also suffered harm.

22     103.   OptumRx's conduct lacks any non-pretextual procompetitive justification.

23 OptumRx forced Plaintiffs to provide Ancillary Services through a Penalty Program so poorly

24 designed that it created neither meaningful benefits to patients nor meaningful efficiencies in

25 the provision of prescription drugs. Notably, OptumRx's Penalty Program was based

26 substantially on Medicare's Star Rating System, designed for health insurance plans, not for

27 pharmacies. Partly for that reason, OptumRx evaluated Plaintiffs' provision of Ancillary Services

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  based on criteria that were outside of Plaintiffs' control, using opaque measures and untimely

2  evaluations.

3      104.    Any purported efficiency achieved by the Penalty Program would be outweighed

4  by the harm to consumers and to other pharmacies. The Penalty Program harmed patient

5  adherence by artificially inflating the prices consumers pay for prescription drugs at the point-

6  of-sale. It also increased the cost of providing services for other pharmacies, driving pharmacies

7  out of business and reducing output for critical pharmacy services, especially in rural

8  communities.

9      105.    In the alternative, OptumRx could have reasonably achieved any purported

10 procompetitive efficiency of the Penalty Program through less anticompetitive means. For

11 example, OptumRx could have paid Plaintiffs to provide certain Ancillary Services suitable to

12 their competencies as pharmacies, as it has in the past. To illustrate, OptumRx has

13 compensated pharmacies in exchange for providing well-defined services such as

14 comprehensive medication review consultations.

15                    **OptumRx's Unlawful Contracts**

16     106.    OptumRx imposes DIR fees and forces pharmacies to provide DIR Services at a

17 loss through contracts that are not the subject of arms-length negotiation. OptumRx leverages

18 its market power, vertical integration with the Part D Plans, and access to networks of Medicare

19 beneficiaries to impose numerous, lengthy, one-sided contracts to the Independents as part of

20 a "take it or leave it" package.[24] Independents cannot afford to push back against OptumRx

21 because they risk losing access to beneficiaries. The opposite is not true—OptumRx can steer

22 and prefers to steer patients to its own mail-order pharmacy. To be sure, community members

23 suffer as a result—from losing pharmacy services or receiving inadequate services. Such

24

25

----

26 [24] FTC Report at 1 ("PBMs also exert substantial influence over independent pharmacies, who
   struggle to navigate contractual terms imposed by PBMs that they find confusing, unfair,
27 arbitrary, and harmful to their businesses.").

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  decreases in output and quality are standard consequences when businesses with market

2  power exclude competition and artificially inflate prices.

3    107.    The OptumRx "contracts" consist of numerous documents, which OptumRx

4  frequently unilaterally amends.

5    108.    These contracts are one-sided, creating an extraordinary imbalance in

6  obligations. For example, under the contracts OptumRx at times reimburses the pharmacy

7  services providers *for less than their cost of acquiring drugs.* In other words, OptumRx forces

8  pharmacy services providers to fill prescriptions at a loss. When accounting for administrative

9  costs and DIR fees, it can become financially crippling to fill prescriptions at below acquisition

10 cost under the terms of the OptumRx contracts.

11    109.    OptumRx sets the terms of its contracts with Independents. There is no

12 meaningful opportunity to negotiate, as Independents are forced to accept inequitable terms

13 or to lose access to millions of beneficiaries serviced by OptumRx and the Plans with which it

14 works. OptumRx leverages its market power and unique position as a corporate affiliate of

15 UnitedHealth Group to coerce the Independents to accept the imposition of DIR fees.

16    110.    Nor can Plaintiffs or other independent pharmacies turn to the federal

17 government for assistance. CMS follows a policy of "noninterference" and does not police

18 PBMs in their negotiations with pharmacies. The applicable statute states, "I]n order to

19 promote competition under this part and in carrying out this part, the Secretary (1) may not

20 interfere with the negotiations between drug manufacturers and pharmacies and PDP

21 sponsors" Part D Plans.  42 U.S.C. § 1395w-111(i).  CMS has added that it "generally do[es] not

22 interfere in plan-pharmacy contract negotiations or opine on the reasonableness or relevancy

23 of specific contractual terms."  74 Fed. Reg. 1,494, 1510 (Jan. 12, 2009); *see also* 70 Fed. Reg.

24 4,194, 4255 (Jan. 28, 2005).

25    111.    That is not to say that OptumRx and other PBM middlemen have carte blanche in

26 their contracts with pharmacies on behalf of Part D Plans.  OptumRx is subject to several

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    statutory and regulatory requirements in its contracting with pharmacies that it regularly

2    violates.

3         112.    For example, Medicare Part D requires Part D Plans—and their PBM

4    representatives— to contract with any willing pharmacy that meets the Plan's standard terms

5    and conditions. 42 CFR § 423.120(a)(8)(i). Moreover, the terms must be "reasonable and

6    relevant." 42 CFR § 423.505. Numerous states have passed their own "any willing provider"

7    statutes, and OptumRx's contracts set forth those laws. Yet pursuant to the terms of the

8    contract, OptumRx has imposed arbitrary, retroactive DIR fees that are not "reasonable."

9    Likewise, OptumRx's reimbursement rates are often below the acquisition cost of the drug:

10   terms that reimburse below cost are unreasonable. Moreover, many Independents are willing

11   and ready to provide Filling and Dispensing Services, but not Ancillary Services. OptumRx

12   requires Independents to do both.

13        113.    Medicare Part D also prohibits OptumRx and other PBMs from requiring

14   pharmacies to accept "insurance risk."  42 U.S.C. § 1395w-104(b)(1)(A, E); 42 CFR §

15   423.120(a)(8)(ii).  "Insurance risk" is defined as "risk of the type commonly assumed only by

16   insurers licensed by a State and does not include payment variations designed to reflect

17   performance-based measures of activities within the control of the pharmacy, such as

18   formulary compliance and generic drug substitution."   42 U.S.C. § 1395w-151(a)(7); *see also*

19   42 CFR § 423.4.  The prohibited insurance risk includes performance-based measures outside

20   the control of the pharmacy.  *Id*.  OptumRx's Penalty Program and other conditions of the

21   contract force insurance risk on pharmacies in direct contravention to the regulatory scheme.

22        114.    Likewise, federal law requires prompt payment of "clean claims" (claims for

23   reimbursement with no defect or impropriety) that are submitted electronically by an

24   Independent within 14 days after the claim has been received, or within 30 days of receiving

25   any other claim. 42 U.S.C. §1395w-112. Yet Independents must wait for months or even years

26   for to settle their transactions with OptumRx because of its improper Penalties.

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

115.    As a result, OptumRx has breached its contracts with Independents because despite its promises to perform the contracts legally, it regularly violates state and federal law in its relationship with pharmacy services providers.

116.    OptumRx seeks to shield its unlawful conduct from being challenged by including in its contracts with Independents a forced arbitration clause with several unconscionable terms. They include giving OptumRx the power to change the terms of the clause unilaterally, to force Independents to submit to expensive arbitration, even to determine the unconscionability of the arbitration provisions, and to impose prohibitive costs on Independents that initiate arbitration. A court[25] has recently describe OptumRx's arbitration scheme as follows:

> [I]n all but the most substantial disputes the cost of proceeding to arbitration will substantially outweigh any benefit that could be achieved in arbitration and that this will undoubtedly have a substantial chilling effect upon pharmacies presenting objectively meritorious positions. "You can't fight City Hall so why try" appears to be the result that this scheme creates. This is the product of a one sided agreement foisted upon pharmacies who need to make a deal with Optum or have a substantial part of a market closed to them and this is fundamentally unfair.

## V.    CLASS ALLEGATIONS

117.    Plaintiffs bring this action on behalf of themselves and all other similarly situated Independents pursuant to Rule 23 of the Federal Rules of Civil Procedure as a representative of a class (the "Class") defined as follows:

> All pharmacy services providers in the United States that are not members of the same corporate family as a Big Three PBM and that have paid DIR fees directly to OptumRx from September 26, 2019 until the time of trial (the "Class Period").

---

[25] Optum, RX, Inc. v. Marinette-Menominee Prescription Center, Ltd., 2023 WL 4485615, at *1 (Wis. Cir. June 30, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT - 28

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

118.    Thousands of Independents have entered contracts with OptumRx that impose unlawful DIR fees during the Class Period. The Class is so numerous that joinder is impracticable.

119.    Plaintiffs' claims are typical of claims of the Class.

120.    Plaintiffs and all members of the Class were injured by the unlawful DIR fees imposed by OptumRx.

121.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The Plaintiffs' interests are not antagonistic to those of the Class.

122.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of antitrust and other class actions.

123.    Questions of law and fact are common to members of the proposed Class and predominate over questions, if any, that may affect only individual members. OptumRx has acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in OptumRx's unlawful contracts and anticompetitive conduct more fully alleged herein.

124.    Questions of law and fact common to the class include:

a)    Whether OptumRx has market power;

b)    Whether OptumRx violated the antitrust laws;

c)    Whether OptumRx violated its contracts;

d)    Whether OptumRx violated federal Medicare laws and regulations;

e)    Whether OptumRx's actions breached the covenant of good faith and fair dealing inherent in its contracts;

f)    Whether OptumRx's imposition of DIR fees was unconscionable;

g)    Whether Plaintiffs and members of the proposed class have been injured by paying unlawful DIR fees; and

h)    The proper measure of damages.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

125.    The Class is readily identifiable from information and records in the possession of OptumRx.

126.    Class treatment is a superior method for the fair and efficient adjudication of the controversy than individual treatment in that, among other things, class treatment will permit a large number of similarly situated Independents to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that might arise in management of this class action.

127.    Plaintiffs know of no difficulties in maintenance of this action on a class basis.

## VI.    CAUSES OF ACTION

### First Claim for Relief
### Sherman Act, 15 U.S.C. § 1, § 2

128.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

129.    OptumRx's conduct violated Section 1 and 2 of the Sherman Act.

130.    OptumRx abused its market power in the Filling and Dispensing Services market to coerce Plaintiffs and the proposed Class to pay to provide Ancillary Services on terms Plaintiffs and the proposed Class would not otherwise accept. OptumRx has substantial economic power in the Primary Market for Filling and Dispensing Services. Contracting with OptumRx is the sole means by which a pharmacy services provider can access OptumRx's network of beneficiaries to provide Filling and Dispensing Services. OptumRx conditioned transactions in the Filling and Dispensing Services market on Plaintiffs and the proposed Class consenting to pay DIR fees for transactions in the Ancillary Services market.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

131.    OptumRx has a direct economic interest in coercing Plaintiffs and the proposed Class to participate in the Ancillary Services market. The DIR Fees Plaintiffs and the proposed Class incurred for providing Ancillary Services benefit OptumRx in many ways.

132.    The markets for Filling and Dispensing Services and Ancillary Services are distinct. Pharmacies have historically provided Filling and Dispensing Services without providing Ancillary Services. That is what OptumRx allowed Plaintiffs and the proposed Class to do before it implemented its Penalty Program. It is what OptumRx does outside of the Medicare Part D context. It is what it has begun to do again now that CMS has closed the purported loophole that OptumRx claimed allowed it to impose post-point-of-sale Penalties as "DIR fees."

133.    OptumRx's conduct has foreclosed competition in the Filling and Dispensing and Ancillary Services markets, affecting a substantial volume of commerce.

134.    OptumRx has engaged in a per se unlawful tying arrangement, and the Court need not and should not assess any asserted procompetitive justifications for it in finding an antitrust violation.

135.    Additionally, OptumRx's conduct violated the rule of reason and was unlawful for the same economic reasons a tie is unlawful. OptumRx coerced Plaintiffs and the proposed Class to engage in a business transaction—to provide Ancillary Services—on terms they otherwise would not have accepted.

136.    As a direct and proximate result of the foregoing conduct, Plaintiffs and members of the proposed Class have been injured by paying artificially inflated prices for the opportunity to provide Ancillary Services when they otherwise would not do so. The conduct also drove members of the Proposed Class—particularly those in rural areas—to close locations or go out of business, artificially decreasing the quality and quantity of services that pharmacies provide. Further, the requirement that Plaintiffs and the proposed Class perform Ancillary Services that they are poorly situated to perform  artificially inflated healthcare costs.

137.    OptumRx's conduct has substantial anticompetitive effects.

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

138.    OptumRx's conduct lacks any nonpretextual procompetitive rationale, and, if it had one, OptumRx could reasonably achieve any procompetitive efficiencies through less anticompetitive means.

139.    The anticompetitive effects of OptumRx's conduct outweighs any procompetitive efficiencies it might have.

140.    Any procompetitive effects from OptumRx's conduct could have been achieved by substantially less anticompetitive means.

**Second Claim for Relief**
**Breach Of Contract**

141.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

142.    OptumRx entered contractual relationships with Plaintiffs and members of the proposed Class whereby OptumRx promised to abide by applicable laws and regulations. OptumRx did not do so.

143.    OptumRx regularly violates Any Willing Provider regulations in Medicare, including 42 U.S.C. § 1395w-104(b)(1)(A) and 42 C.F.R. 423.120(a)(8)(i).

144.    OptumRx also violates Medicare regulations requiring prompt payment of claims. 42 C.F.R. 423.520.

145.    OptumRx also regularly violates state laws regulating pharmacy benefit managers, including any willing provider laws and prompt payment laws.

146.    OptumRx also violates the Medicare Part D requirement prohibiting PBMs from requiring pharmacies to accept "insurance risk."  42 U.S.C. § 1395w-104(b)(1)(A, E); 42 CFR § 423.120(a)(8)(ii).

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

**Third Claim for Relief**

**Declaratory Judgment of Illegality Based on Violation of Medicare Laws and Regulations**

147.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

148.    Plaintiffs seek a declaration from the Court of the following:

149.    OptumRx imposed on Plaintiffs, as a condition of participation in OptumRx's pharmacy networks, a requirement that Plaintiffs accept risk of the type commonly assumed only by licensed insurance, in violation of the Medicare Act rules and regulations, including 42 U.S.C. §423.120.

150.    OptumRx's unlawful contracts violated the Any Willing Provider regulations.

151.    OptumRx's unlawful contracts violated the Prompt Payment regulations.

152.    Additionally, OptumRx unlawfully imposed Penalties post-point of sale in violation of 42 U.S.C. 423.100.

153.    Plaintiffs have no recourse to administrative review or administrative resolution of its claims of violations of Medicare Act regulations because, by statute, CMS follows a policy of "noninterference" and does not police OptumRx or other pharmacy benefit managers in their negotiations with pharmacies. *See, e.g.*, 42 U.S.C. § 1395w-111(i).

**Fourth Claim for Relief**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

154.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

155.    OptumRx entered contractual relationships with Plaintiffs and members of the proposed Class and owed them a duty to act in good faith and deal fairly.

156.    The conduct of OptumRx described in this complaint violated the implied covenant of good faith and fair dealing, including because OptumRx exercised discretion and

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    performed its contractual obligations in bad faith and in a manner that denied Plaintiffs and

2    members of the proposed Class the benefit of their bargains.

3        157.    Such acts and omissions leading to OptumRx's breach of duty to deal in good

4    faith and fairly with Plaintiffs and members of the proposed Class were the actual and

5    proximate cause of harm to them.

**Fifth Claim for Relief**
**Declaratory Judgment of Unconscionability**

8        158.    Plaintiffs incorporate by reference the allegations contained in the preceding

9    paragraphs as if fully set forth herein.

10       159.    Certain terms of the OptumRx contract are both substantively and procedurally

11   unconscionable. For example, the contract provisions related to DIR fees require Plaintiffs to

12   pay to provide Ancillary Services to OptumRx, demonstrating an extreme imbalance in rights

13   and obligations between the parties. These provisions are unreasonable and were presented to

14   Plaintiffs on a "take it or leave it" basis, revealing the extreme unfairness in the bargaining

15   process between Plaintiffs and OptumRx.

16       160.    Plaintiffs seek a declaratory judgment from this Court stating that the imposition

17   of DIR fees was unconscionable and therefore unenforceable.

**Sixth Claim for Relief**
**Unjust Enrichment**

20       161.    Plaintiffs incorporate by reference the allegations contained in the preceding

21   paragraphs as if fully set forth herein.

22       162.    Plaintiffs and members of the proposed Class conferred benefits on OptumRx by

23   providing Filling and Dispensing Services and DIR Services to beneficiaries covered by Plans it

24   administered.

25       163.    OptumRx benefited from those services at the expense of Plaintiff and members

26   of the proposed Class by receiving compensation under its contracts with its Plans and

27   otherwise.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

164.    It would be unjust to allow OptumRx to keep the benefits of the services of Plaintiff and members of the proposed Class.

### Seventh Claim for Relief
### Quantum Meruit

165.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

166.    Plaintiffs and members of the proposed Class conferred benefits on OptumRx by providing Filling and Dispensing Services and DIR Services to beneficiaries covered by Plans it administered.

167.    OptumRx accepted the services or materials.

168.    The unconscionability of OptumRx's actions renders the contracts between Plaintiffs and members of the proposed Class and OptumRx unenforceable as they relate to DIR fees.

169.    OptumRx should be required to pay Plaintiffs and members of the proposed Class for the value of the DIR Services they provided.

### VII.    DEMAND FOR RELIEF

Plaintiffs respectfully asks this Court:

A.    to enter judgment awarding damages to Plaintiffs and members of the proposed Class in an amount to be determined, and trebled as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15(a), on their federal antitrust claims;

B.    to award Plaintiffs and members of the proposed Class restitution;

C.    to award Plaintiffs and members of the proposed Class the cost of this suit, including reasonable attorney's fees, as provided in Section 4 of the Clayton Act, 15 U.S.C. § 15, on their federal antitrust claims; and

D.    to order such other and further relief as this Court deems proper and just.

### VIII.    DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

2          RESPECTFULLY SUBMITTED AND DATED this 14th day of February, 2025.

3                                    TERRELL MARSHALL LAW GROUP PLLC

4
                                     By: /s/Beth E. Terrell, WSBA #26759
5                                        Beth E. Terrell, WSBA #26759
6                                        Email: bterrell@terrellmarshall.com

7                                    By: /s/Amanda M. Steiner, WSBA #29147
8                                        Amanda M. Steiner, WSBA #29147
                                         Email: asteiner@terrellmarshall.com
9
                                     By: /s/Blythe H. Chandler, WSBA #43387
10                                       Blythe H. Chandler, WSBA #43387
                                         Email: bchandler@terrellmarshall.com
11                                       936 N. 34th Street, Suite 300
12                                       Seattle, Washington 98103
                                         Telephone: (206) 816-6603
13                                       Facsimile: (206) 319-5450

14                                       Joshua Davis, *Admitted Pro Hac Vice*
15                                       Email: jdavis@bm.net
                                         Paul Bland, *Pro Hac Vice Forthcoming*
16                                       Email: pbland@bm.net
17                                       Julie Pollock, *Admitted Pro Hac Vice*
                                         Email: jpollock@bm.net
18                                       BERGER MONTAGUE P.C.
                                         505 Montgomery St, Suite 625
19                                       San Francisco, CA 94111
20                                       Telephone: (415) 906-0684

21                                       John Roberti, *Admitted Pro Hac Vice*
22                                       Email: jroberti@zaigerllc.com
                                         Zaiger Linden Roberti LLC
23                                       1629 K St., NW, Suite 300
                                         Washington, DC 20006
24                                       Telephone: (202) 978-2375

25                                    *Attorneys for Plaintiff and Proposed Class*

26

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

- Exhibit 1 -

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244-1850



OFFICE OF THE ADMINISTRATOR

December 14, 2023

Dear Pharmacy Benefit Managers, Medicare Part D Plans, Medicaid Managed Care Plans, and Private Insurance Plans:

The Centers for Medicare & Medicaid Services (CMS) values your partnership in providing health care coverage and access to essential treatments, including prescription medications, to millions of people. However, we are hearing an increasing number of concerns about certain practices by some plans and pharmacy benefit managers (PBMs) that threaten the sustainability of many pharmacies, impede access to care, and put increased burden on health care providers. We are writing to share these concerns and to encourage you to work with providers and pharmacies to alleviate these issues and safeguard access to care. This is especially important for vaccines and treatments that can prevent and treat influenza, COVID-19, and RSV as we enter the winter respiratory virus season.

Pharmacies serve a critical role in delivering health care and providing access to medications across the country. CMS is concerned about the sustainability of these businesses, especially small and independent pharmacies, and their potential closures that may leave pharmacy services out of reach for many people, especially those in rural and underserved areas. With respect to the Medicare Part D program, CMS finalized a pharmacy price concessions provision in the Contract Year 2023 Medicare Advantage and Part D final rule that is expected to lower total beneficiary out-of-pocket costs, provide meaningful price transparency, better reflect pharmacy payment arrangements, and enable CMS to assess the payment practices of Part D plan sponsors and PBMs with respect to pharmacies under the Medicare Part D program.[1] This provision takes effect January 1, 2024, and requires the application of all pharmacy price concessions to the negotiated price at the point of sale. CMS has heard many concerns regarding the potential impact on pharmacy cash flow upon implementation of this provision, and we finalized a one-year delay in the effective date of the policy to provide sufficient time for implementation. **We continue to hear urgent concerns from pharmacies, and we strongly encourage Part D plan sponsors and their PBMs to make necessary cash flow arrangements with network pharmacies in preparation for these upcoming changes. In addition, we will closely monitor**

---

[1] See final rule titled, "Medicare Program; Contract Year 2023 Policy and Technical Changes to the Medicare Advantage and Medicare Prescription Drug Benefit Programs" (CMS-4192-F) (87 FR 27704) at: https://www.govinfo.gov/content/pkg/FR-2022-05-09/pdf/2022-09375.pdf.

**plan compliance with pharmacy access and prompt payment standards to ensure that all people with Medicare Part D continue to have access to pharmacies and medications.**[2]

We have also heard from pharmacies that the amount plan sponsors and PBMs that serve plans in Medicare, Medicaid, and the Children's Health Insurance Program (CHIP), and plans offered through the Marketplaces pay pharmacies for some vaccine administrations is causing many pharmacies and other providers of vaccines to lose money administering vaccines, discouraging them from providing these vaccines. **Particularly as we encourage people to get vaccinated against influenza, COVID-19, and RSV this year, CMS is very concerned about payment practices that may impede access to recommended vaccinations, and it is imperative that plans and PBMs take immediate steps to ensure adequate payment for and access to vaccines.**

In addition, we know that the increasing level of vertical integration that is occurring among plans, PBMs, and their own pharmacies has the potential to result in anticompetitive behavior and place independent pharmacies at a disadvantage. **We urge plans and PBMs to engage in sustainable and fair practices with all pharmacies – not just pharmacies owned by PBMs – and we are closely monitoring plan compliance with CMS network adequacy standards and other requirements.**

We have also heard of concerns from stakeholders and consumers that privately insured patients and providers continue to experience a difficult time navigating plan and issuer exceptions processes for medically necessary contraceptive drugs, items, and services required to be covered under the Affordable Care Act. In addition, we have seen plans and issuers impose cost sharing on coverage of preventive services due to claims being submitted with unrelated diagnostic codes or because the provider did not use a specific preventive care procedure code required by the plan or issuer. We are investigating these concerns within our jurisdiction. **We urge plans, issuers, and PBMs to check their processes and systems to ensure they are providing full coverage, without cost sharing, of preventive services, as required by federal law.**

We also want to highlight that most children enrolled in Medicaid and CHIP have coverage of all routine Advisory Committee on Immunization Practices (ACIP)-recommended vaccines and vaccinations determined to be medically necessary for beneficiaries eligible for the Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) benefit without cost sharing. Most adults enrolled in Medicaid and CHIP have coverage of FDA-approved and ACIP-recommended vaccinations without cost sharing because requirements established in the Inflation Reduction Act (IRA) became effective on October 1, 2023. This new IRA adult vaccine coverage applies to all types of ACIP recommendations. Additional information can be found in our recent guidance and fact sheet on the new IRA vaccine coverage for adults. Additionally, COVID-19 vaccinations are mandatorily covered for nearly all Medicaid and CHIP beneficiaries through September 30, 2024, in accordance with the American Rescue Plan Act of 2021. **We urge plans, as well as states, to ensure that their guidance and systems reflect this coverage.**

---

[2] See Health Plan Management System (HPMS) memo titled, "Application of Pharmacy Price Concessions to the Negotiated Price at the Point of Sale Beginning January 1, 2024" at: https://www.cms.gov/about-cms/information-systems/hpms/hpms-memos-archive-weekly/hpms-memos-wk-2-november-6-10.

Finally, we often hear concerns about the impact of plans' utilization management tools, including prior authorization. The inappropriate use of these tools can impede access to needed care for people and delay essential treatments, as well a take clinician time away from direct care. Providers, especially those in rural areas, report that these plan practices have become increasingly unsustainable and burdensome. Earlier this year, CMS finalized vital protections that will be effective on January 1, 2024, to ensure Medicare Advantage enrollees have timely access to needed care and to crack down on harmful disruptions to care. We have also proposed new requirements to improve access to patient health information and to address avoidable delays in patient care by streamlining the electronic exchange of health care data and processes related to prior authorization for Medicare Advantage organizations, state Medicaid and CHIP Fee-for-Service programs, Medicaid managed care plans and CHIP managed care entities, and Qualified Health Plan issuers on the Federally Facilitated Marketplaces. **We remind plans that CMS will be conducting robust oversight to ensure Medicare Advantage organizations are complying with these new requirements, and we continue to review comments received on the additional proposals from the second rulemaking.**

Thank you for your attention to these issues.

Sincerely,

Chiquita Brooks-LaSure
Administrator

Jonathan Blum
Principal Deputy Administrator and
Chief Operating Officer

Meena Seshamani, M.D., Ph.D.
Deputy Administrator and Director
Center for Medicare

Daniel Tsai
Deputy Administrator and Director
Center for Medicaid and CHIP Services

Ellen Montz, Ph.D.
Deputy Administrator and Director
Center for Consumer Information and
Insurance Oversight